LESLIE A. BAILEY (SBN 232690)
lbailey@publicjustice.net
BRIAN HARDINGHAM (SBN 288773)
bhardingham@publicjustice.net
PUBLIC JUSTICE
475 14th St., Ste. 610
Oakland, CA 94612
Telephone: (510) 622-8150

CHARLES MOORE*
cmoore@publicjustice.net
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600

*Admitted *pro hac vice*

*Attorneys for Plaintiff*

BRIAN D. OLNEY (SBN 298089)
bolney@hadsellstormer.com
HADSELL STORMER RENICK & DAI LLP
128 North Fair Oaks Avenue
Pasadena, CA 91103
Telephone: (626) 585-9600

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PHILLIP URQUIDI;

        Plaintiff,

    vs.

CITY OF LOS ANGELES, a municipal
corporation; and MICHEL R. MOORE, in his
individual capacity.

        Defendants.

Case No. 2:23-cv-02568-JGB-SP

**FIRST AMENDED COMPLAINT**

1) **Declaratory and Injunctive Relief (28
   U.S.C. § 2201, 42 U.S.C. § 1983)**
2) **Fourth Amendment (42 U.S.C. § 1983,
   Fourth Amendment)**
3) **Procedural Due Process (42 U.S.C.
   § 1983, Fourteenth Amendment)**
4) **Excessive Fines (42 U.S.C. § 1983, Eighth
   Amendment)**
5) **Substantive Due Process (42 U.S.C.
   § 1983, Fourteenth Amendment)**
6) **Unlawful Seizure (Cal. Const. Art. I § 13)**
7) **Bane Act (Cal. Civil Code § 52.1)**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Phillip Urquidi ("Plaintiff" or "Mr. Urquidi") brings this action against the City of Los Angeles (the "City") and Michel R. Moore ("Chief Moore"), in his individual capacity (collectively referred to as "Defendants"), challenging, first, the initial towing of Plaintiff's vehicle in violation of the community caretaking exception to the Fourth Amendment's prohibition on warrantless seizures; second, Defendants' practice of unlawfully impounding vehicles—and then requiring payment of excessive fines in order to procure release of such vehicles—without consideration of an individual's ability to pay or status as unhoused; and, third, Defendants' inflicting a danger on Plaintiff by depriving him of his vehicle and primary residence. Defendants first seized Plaintiff's vehicle on February 20, 2023—and refused to release the vehicle for two months—and then seized it for a second time on April 28, 2023. Defendants' actions and practices violate, *inter alia*, the Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution; Article I, Section 13 of the California Constitution; and the Tom Bane Civil Rights Act, codified as Section 52.1 of the California Civil Code (the "Bane Act").

Defendants' actions have violated Mr. Urquidi's constitutional rights; deprived him of his sole residence, resulting in extraordinary hardship; and caused severe pain, suffering, and emotional injury. The primary injury Mr. Urquidi alleges in this action is the loss of his truck, which he has relied on as his primary residence for the past year. The primary relief Mr. Urquidi seeks is the return of his truck and an injunction prohibiting Defendants from continuing to violate his rights through future unconstitutional seizure of his truck and home. Mr. Urquidi also seeks monetary damages incidental to the injunctive and declaratory relief for the repeated violations of his constitutional rights and under his state law claims brought pursuant to the Bane Act.

In support of his Complaint, Plaintiff alleges the following:

# I.    INTRODUCTION

1.      In Los Angeles, Defendants have implemented a scheme whereby officers tow vehicles upon arrest—even if there is an authorized individual who can take possession of the vehicle; even if the alleged offense has no relation to the vehicle; and even if the vehicle is the person's only shelter, and law enforcement is aware that the vehicle's owner is unhoused—and towing companies demand exorbitant fees to secure the vehicles' release. Those vehicles remain on

the lots of for-profit tow garages that contract with the City, unless the owner can access the cash needed—often hundreds or thousands of dollars—to pay for the vehicle's release. The less money the owner has, the less likely they will be able to pay, and, since the fines[1] increase every day, the poorest Los Angeles residents risk owing the most in fines. At no point in this process do Defendants provide *any* process by which an individual can demonstrate they lack the means to pay. Thus, if a vehicle owner is too poor to pay the fines required, their only option is to forfeit their car permanently. At any point thirty-one days after the car is impounded, the towing company can schedule the car to be sold at auction and, if the sale price is lower than the fines owed at the time of sale, the City can pursue the owner for the difference. All the while, the legal owner of the vehicle is without the use of their car and perhaps, as in the case of many unhoused individuals, their sole shelter.

2.    Practices such as the ones employed by Defendants can have devastating consequences for individuals whose cars are seized, while enriching municipalities and cooperating garages. *See, e.g.*, *In Memphis, Car Seizures Are a Lucrative and Punishing Police Tactic*, N.Y. Times (Mar. 23, 2023), https://www.nytimes.com/2023/03/23/us/memphis-police-vehicle-seizures-forfeiture.html.

3.    When Phillip Urquidi became homeless after losing his job over a year ago, he began sleeping in his truck. Since that time, his truck has been his primary shelter. But when Mr. Urquidi was arrested, the City of Los Angeles Police Department ("LAPD") and its officers declined to either release the vehicle to his family or legally park it, removed the truck from his family's home, and had it towed to a garage owned by Jon's Towing Inc. ("Jon's Towing"). Mr. Urquidi's truck remained there for approximately two months solely because he could not afford to pay the excessive sum required by Defendants for the release of his vehicle. Defendants were aware that Mr. Urquidi is homeless and unable to pay, but refused to provide him with any opportunity to

---

[1] While Defendants describe the multiple fines imposed in various ways—such as a "tow charge," "lien fee," "city tax," "vehicle release fee," "storage fee," and a number of other "rates," *see Towing and Storage Rates*, OPG (last visited May 1, 2023), http://www.opgla.com/Rates; *Vehicle Detail*, Official Police Garages, https://www.opglaviic.com (last visited May 1, 2023)—this filing refers to those amounts simply as "fines."

contest the fines or establish his inability to pay them. Further compounding the problem, the fines continued to rise daily as long as the vehicle was held, and Mr. Urquidi did not have access to what was his only shelter.

4. Defendants' towing of Mr. Urquidi's truck was unlawful on the day it occurred. Defendants employ a practice of impounding the vehicles upon arrest without consideration for whether an individual relies on that vehicle for shelter. In fact, Defendants often are aware that the individual resides in the vehicle, as in Mr. Urquidi's case. LAPD refused to release the vehicle to a family member, who was present and could have parked the car legally, or move the truck to the side of the road so that it was legally parked. By nonetheless towing Mr. Urquidi's car, LAPD officers acted unreasonably and beyond the bounds of the Fourth Amendment. What's more, by towing Plaintiff's vehicle, Defendants knowingly deprived him of his sole residence at a time when sleeping outdoors presented a heightened risk due to the severe inclement weather. After that, the constitutional violations only worsened. Mr. Urquidi was denied due process through Defendants' refusal to consider his inability to pay, Defendants demanded impermissibly excessive fines to procure the release of the vehicle, and Defendants knowingly created a distinct risk for Mr. Urquidi by unlawfully confiscating his residence.

5. Because of Defendants' actions, Mr. Urquidi was without his vehicle—and primary residence—for approximately two months, from February 20, 2023 to April 20, 2023, when the vehicle was released during the pendency of this litigation. During that time, Mr. Urquidi was unsuccessful in finding a shelter to house him, so he was forced to either sleep on the street or rely on family in the area to take him in. Defendants' seizure of his vehicle, as well as their practices surrounding the process and fines demanded to retrieve it, therefore, caused Mr. Urquidi significant damages, including emotional distress.

6. Making matters worse, when Defendants seized Mr. Urquidi's vehicle in February 2023, they deprived him of his truck during a period of historically devastating weather. That left Mr. Urquidi without shelter at a time when winter conditions made sleeping outside particularly dangerous. Grace Toohey, *Winter Storms Likely to Bring Los Angeles Its Longest Cold Snap in Almost 20 Years*, L.A. Times (Feb. 28, 2023), https://www.latimes.com/california/story/2023-02-

28/southern-california-winter-storm-los-angeles-long-cold-streak (hereinafter "*Winter Storms Likely*"); Ruben Van Vives, Summer Lin, & Doug Smith, *Southern California Races to Shelter Homeless People as Frigid Storm Bears Down*, L.A. Times (Feb. 23, 2023), https://www.latimes.com/california/story/2023-02-23/region-races-to-shelter-homeless-people-as-frigid-storm-bears-down (hereinafter "*Race to Shelter Homeless People*"); Claire Thornton, *Southern California Blizzard Warning Will Unleash 'Real Danger' Upon Unhoused People in LA County*, USA Today (February 23, 2023), https://www.usatoday.com/story/news/nation/2023/02/23/los-angeles-homeless-winter-storm-snow/11326042002. The extreme weather led Governor Gavin Newsom to declare a state of emergency, noting "conditions of extreme peril to the safety of persons and property exist due to these storms." *Proclamation of a State of Emergency*, Office of the Governor (March 1, 2023), https://www.gov.ca.gov/wp-content/uploads/2023/03/3.1.23-Storms-State-of-Emergency-signed.pdf?emrc=ac8179. Conditions grew so dire that there were even reports of unhoused individuals dying due to the cold. Eliza Kirk, *Unhoused Man Dies Outside of the Eagle Rock Vons During Cold Weather*, The Occidental (Mar. 8, 2023), https://theoccidentalnews.com/community/2023/03/08/unhoused-man-dies-outside-of-the-eagle-rock-vons-during-cold-weather/2908374.

7.    Meanwhile, the costs of retrieving Mr. Urquidi's truck—already insurmountable on the day he was released from jail—skyrocketed. At the time the vehicle was released on April 20, 2023, the fines totaled $5,566.11.

8.    Just over a week after releasing the vehicle, Defendants again seized Mr. Urquidi's truck and are currently holding it at Jon's Towing. In the four days since Defendants seized the vehicle for the second time, the costs of procuring its release have already risen to $668.79.

9.    Defendants' repeated actions demonstrate the customs, practices, and/or policies alleged in this complaint; Defendants' deliberate indifference with regard to the towing and storage of vehicles' belonging to individuals who are unhoused and rely on their vehicles for shelter; and Defendants' failure to train.

10. Ultimately, Defendants' patterns and practices offend the Fourth Amendment's prohibition on warrantless seizures, the constitutional guarantee of due process, and the requirement that any fines imposed not be excessive.

## II.   JURISDICTION

11. Plaintiff brings this suit under 42 U.S.C. § 1983, and the Court has jurisdiction to hear those claims under to 28 U.S.C. §§ 1331 and 1343. The Court also has supplemental jurisdiction to hear Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12. Venue is proper because the causes of action alleged in this complaint occurred in the county of Los Angeles, which is located in the Central District of California.

## III.   PARTIES

13. Plaintiff Phillip Urquidi is 25 years old and resides in Los Angeles County. He brings this lawsuit on behalf of himself.

14. Defendant City of Los Angeles is a public entity organized and existing under the laws of the State of California. The City is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies. The City owns, operates, manages, directs, and controls the Los Angeles Police Department, as well as its officers, employees, and other personnel. At all times relevant to the facts alleged herein, the City was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of its employees complied with the laws and the Constitutions of the United States and of the State of California.

15. Defendant Michel R. Moore is Chief of the LAPD and is responsible for formulating, executing, and administering the laws, customs, and practices that comprise LAPD's towing and storage policy. Chief Moore, as a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of the officers in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Chief Moore is sued in his individual capacity.

16.     Jon's Towing is **not** a defendant in this action. Former defendant[2] Jon's Towing is a California corporation with a principal place of business located at 7930 Deering Ave., Canoga Park, CA 91304. Jon's Towing held Plaintiff's vehicle from February 20, 2023 until April 20, 2023, and is now currently holding the truck. Jon's Towing describes itself as an "Official Police Garage (OPG) for the Los Angeles Police Department" and "the official police garage for the Topanga Division." *About Us*, Jon's Towing Inc., http://jonstowinginc.com/about-us (last visited May 1, 2023). Jon's Towing acts as a State actor by towing and storing vehicles under a contract with the City.

17.     The Official Police Garage Association of Los Angeles, Inc. ("OPG-LA") is **not** a defendant in this action.[3] The members of former defendant OPG-LA are the owners of the eighteen Official Police Garages contracted by the City to store impounded vehicles.

## IV.     FACTUAL ALLEGATIONS

### A.     Defendants Unlawfully Towed and Stored Plaintiff's Vehicle Without Consideration for Either His Status as Unhoused or His Ability to Pay.

18.     Plaintiff has lived in his 2009 Nissan Titan pickup truck, which has a Texas license plate, number MDJ6724, for over a year.

19.     At the time Defendants seized his vehicle on February 20, 2023, Plaintiff supported himself through warehouse work he obtained through a temporary staffing agency. At that time, he relied on CalFresh benefits for food assistance.

20.     On or about February 20, 2023, Plaintiff was arrested.

21.     According to the arrest report, the incident that served as the basis for Plaintiff's arrest took place at 21041 Cohasset St. Canoga Park, CA 91303.

22.     Plaintiff's grandmother and aunt live at 21041 Cohasset Street, Canoga Park, 91303.

23.     At the time of his arrest, Plaintiff's vehicle was on a small residential street outside of his grandmother and aunt's home.

---

[2] Plaintiff released his claims against Jon's Towing related to the impound beginning February 20, 2023 after the vehicle was released on April 20, 2023.

[3] Plaintiff released his claims against OPG-LA (sued as the City of Los Angeles Official Police Garage) after the vehicle was released on April 20, 2023.

24.     Upon his arrest, rather than tow his truck, Plaintiff requested that LAPD give the keys to the vehicle to his family members, who were home at the time, or simply park the truck and give him the keys with the rest of his belonging upon his release from jail. LAPD declined that request.

25.     LAPD Officers Jonathan Rosas (badge number 45035) and/or Jorge Esquivel (badge number 38563) ordered that Plaintiff's vehicle be impounded and towed to Jon's Towing.

26.     At the time Plaintiff was arrested and his vehicle was towed, Defendants were aware that he was homeless and that he relied on his truck for shelter.

27.     Plaintiff was booked at the Topanga Police Station.

28.     Plaintiff's vehicle was towed and stored at Jon's Towing.

29.     During late February 2023, the Los Angeles area experienced extreme cold and snow, and forecasts showed that such weather would continue in the coming weeks. *Winter Storms Likely*. The inclement weather "raised the danger level for thousands of people living outdoors, with a forecast of [] days of rain, freezing temperatures, blizzard-strength wind and low-elevation snow." *Race to Shelter Homeless People*.

30.     After his arrest, Plaintiff was charged with a violation of Section 166(c)(1) of the California Penal Code and spent nine days in jail on Case No. LAV3VW01341-01. Plaintiff pleaded no contest to an offense under that statute and was released from jail on February 28, 2023.

31.     A few days after his release from jail, Plaintiff learned that his vehicle was being stored by Jon's Towing. Plaintiff traveled to the garage and learned that Jon's Towing would not release the vehicle until he paid fines, totaling over eight hundred dollars at that time. He was told that fines would continue to accrue for each day that the vehicle remained on the lot. Plaintiff could not afford to pay the fines.

32.     Without his truck, Plaintiff was forced to sleep outside and, when possible, to rely on local family to take him in.

33.     Plaintiff was unsuccessful in his efforts to find housing at a shelter.

34.     On March 22, 2023, Plaintiff's counsel spoke with a representative of Jon's Towing, who stated that the vehicle was in the lot and that it would only be released upon payment of the full

-8-

FIRST AMENDED COMPLAINT

balance. At that time, the balance, according to the representative from Jon's Towing, amounted to $2,013.70. That representative stated that the fine would increase at a rate of $48 for each day the vehicle remained on the lot.

35.     On March 23, 2023, counsel spoke with Detective Flores, the Auto Supervisor at the Topanga station, and counsel learned that LAPD has no process for assessing an individual's ability to pay.

36.     On March 24, 2023, counsel spoke with Mr. Watts of LAPD's Topanga Division, who was identified as the Auto Clerk. During that conversation, Mr. Watts suggested that many individuals who are unable to procure the release of their vehicles immediately ultimately forfeit them to the impounding garage so as to avoid the continued accumulation of fines.

37.     On March 27, 2023, Plaintiff's counsel again inquired as to the amount owed to Jon's Towing and was informed that the amount due had risen to $2,227.10. Additionally, Plaintiff's counsel learned that no sale of the vehicle had yet been scheduled, but that one may be scheduled imminently.

38.     That same day, Plaintiff's counsel sent a letter to the Los Angeles City Attorney's Office demanding that the City waive all costs and release Plaintiff's vehicle immediately. Jon's Towing was copied on that letter. Counsel requested a response within forty-eight hours.

39.     On March 29, 2023, the City Attorney's Office responded by email stating that the City's position that Mr. Urquidi's truck "was lawfully impounded when [he] was arrested" and that "[t]he City is not obligated to conduct an ability to pay hearing in connection with vehicle impounds."

40.     On April 3, 2023, counsel learned in a phone call to Jon's Towing that $2,615.55 was owed on the truck and that a sale had been scheduled for May 2, 2023.

41.     Plaintiff brought this suit on April 5, 2023.

42.     On April 18, 2023, Plaintiff's counsel requested a post-storage hearing pursuant to Section 22852 of the California Vehicle Code and the Court's minute order of April 10, 2023 (Dkt. No. 20).

43.     On April 19, 2023, according to a public search function operated by OPG-LA, the amount of fines was as follows: a $156.50 tow charge, a $100.00 lien fee, $0.00 for other fees, $247.36 for a city tax, a $115.00 vehicle release fee, and $2,473.63 for storage. *Vehicle Detail*, Los Angeles Official Police Garages, https://www.opglaviic.com (last visited Apr. 19, 2023). On that web page, in a section titled "Impound Info," LAPD was listed as the "agency" and Jon's Towing as the "location." *Id.*

44.     The "total charge," according to the OPG-LA search, was listed as $5,566.11. *Id.* A true and correct copy of the information provided by the OPG-LA search on April 19, 2023 is reproduced below.



45.     On April 20, 2023, during the pendency of this litigation, Jon's Towing released Plaintiff's vehicle and waived his fines to settle Plaintiff's claims against Jon's Towing and OPG-LA.

46.     On April 28, 2023, Defendants again seized Mr. Urquidi's vehicle. According to OPG-LA's public search function, the amount owed to procure release of the vehicle now totals

$668.79.[4] The "location" of the vehicle is listed as Jon's Towing, and the "agency" is listed as LAPD.

47.     Defendants employ a custom, practice, and/or policy of towing and storing vehicles upon arrest without consideration for whether the vehicles' owners are unhoused and rely on their vehicles as their sole residence.

48.     Defendants have failed to train officers on the appropriate protocol for making a determination consistent with the Fourth Amendment of whether to impound the vehicle of an individual who is unhoused and relies on their vehicle for shelter.

49.     Defendants have shown a deliberate indifference in impounding and failing to train officers with regard to the impound of vehicles belonging to unhoused individuals who rely on their vehicles for residence.

50.     Once impounded, Defendants impose unjustifiable fines that work to deprive individuals permanently of their vehicles.

51.     As Chief of LAPD, Chief Moore is a final policymaker for the City and is responsible for approving and/or ratifying the unconstitutional customs, practices, and/or policies alleged herein.

52.     Defendants deprived Plaintiff of his vehicle—which was also his sole residence— from February 20, 2023 to April 20, 2023. Defendants demanded thousands of dollars to release the vehicle. A little more than a week after the vehicle's release, Defendants seized Plaintiff's vehicle again on April 28, 2023.

**B.     Legal Framework.**

53.     Defendants derive their authority to tow and store vehicles from Section 22651 of the California Vehicle Code. That statute provides that "a peace officer . . . may remove a vehicle located within the territorial limits in which the officer or employee may act . . . [i]f an officer arrests a person driving or in control of a vehicle for an alleged offense and the officer is, by this code or

---

[4] That total is comprised of the following charges: a $156.50 tow charge, $0.00 for a lien fee, $0.00 for other charges, a $18.92 city tax, $115.00 for a vehicle release fee, and $189.18 for storage fees. *Vehicle Detail*, Los Angeles Official Police Garages, https://www.opglaviic.com (last visited May 1, 2023).

other law, required or permitted to take, and does take, the person into custody." Cal. Veh. Code § 22651(h).

54.     Once a vehicle "is removed pursuant to" Section 22651, "the vehicle may be impounded." *Id.* § 22651(i).

55.     "A vehicle shall be released to the legal owner . . . if the legal owner . . . [p]ays the cost of towing and storing the vehicle." *Id.* § 22651(i)(4)(A).

56.     Upon removal, "the keeper [of the garage where the vehicle is stored] shall have a lien dependent upon possession for his or her compensation for towage and for caring for and keeping safe the vehicle." *Id.* § 22851(a)(1).

57.     The statute defaults to a lien "for a period not exceeding 60 days." *Id.* For vehicles on a sixty-day lien, those "with a value determined to be four thousand dollars ($4,000) or less, the lienholder shall apply to the [California Department of Motor Vehicles] for the names and addresses of the registered and legal owners of record." Cal. Civ. Code § 3072(a). Upon receipt of those names and addresses, the lienholder must send a Notice of Pending Lien Sale form "to the registered owner and legal owner" as well as "any other person known to have an interest in the vehicle." *Id.* § 3072(b). Such notice shall state, among other things, "[t]he specific date, exact time, and place of sale, which shall be set not less than 31 days, but not more than 41 days, from the date of mailing." *Id.* § 3072(c)(2). If, within ten days of the date mailing the Notice of Pending Lien Sale, a Declaration of Opposition "is signed and returned, the lienholder shall be allowed to sell the vehicle only if he or she obtains a court judgment or if he or she obtains a subsequent release from the declarant or if the declarant cannot be served as described in subdivision (e)." *Id.* § 3072(c)(4)(D).

58.     Alternatively, the lien will be for a period of 120 days "if an application for an authorization to conduct a lien sale has been filed pursuant to Section 3068.1 of the Civil Code within 30 days after the removal of the vehicle to the garage." Cal. Veh. Code § 22851(a)(1). An application for an authorization to conduct a lien sale may be filed for a number of reasons, including if a Declaration of Opposition is filed or if the vehicle at issue has an out-of-state registration. Cal. Civ. Code § 3068.1(b). Such an application must be made "for any vehicle with a value determined to be over four thousand dollars ($4,000)." *Id.* § 3071(a). "Upon receipt of authorization to conduct

-12-
FIRST AMENDED COMPLAINT

the lien sale from the department, the lienholder shall . . . [a]t least five days, but not more than 20 days, prior to the lien sale, not counting the day of the sale, give notice by advertising once in a newspaper of general circulation" and send a Notice of Pending Lien Sale form "20 days prior to the sale" to the registered and legal owners as well as "[a]ll persons known to have an interest in the vehicle." *Id.* § 3071(f).

59.    "The proceeds of a vehicle lien sale . . . shall be disposed of as follows: (a) The amount necessary to discharge the lien and the cost of processing the vehicle shall be paid to the lienholder. . . . (b) The balance, if any, shall be forwarded to the Department of Motor Vehicles . . . ." *Id.* § 3073(a), (b).

60.    For its part, the impounding agency "has a lien on the surplus that remains upon the sale of a vehicle," and "has a deficiency claim against the registered owner . . . for all local administrative charges imposed pursuant to Section 22850.5, less the amount received from the sale of the vehicle." Cal. Veh. Code § 22651(i)(5).

61.    Within ten days after the towing and storage, the registered owner of the vehicle may request "a poststorage hearing to determine the validity of the storage." *Id.* at § 22852(a). Defendants conduct these hearings solely "to determine whether probable cause existed to impound a particular vehicle and to determine who is responsible for the payment of the impound and/or storage fees." *2022 Department Manual*, LAPD, Vol. 4 § 226.05 (Post-Impound Hearings) (Jan. 26, 2023), available at: https://www.lapdonline.org/lapd-manual.

62.    "The public agency may authorize its own officer or employee to conduct the hearing if the hearing officer is not the same person who directed the storage of the vehicle." Cal. Veh. Code § 22852(c). If after the hearing the agency determines there are "no reasonable grounds for the storage," then "[t]he agency employing the person who directed the storage shall be responsible for the costs incurred for towing and storage . . . ." *Id.* § 22852(e).

63.    However, Defendants expressly do not consider an individual's ability to pay the fines assessed for the towing and storage of the vehicle in a post-impound hearing. *See Fitzpatrick v. City of Los Angeles*, No. 2:21-cv-06841-JGB-SP, ECF No. 106 at 22 (C.D. Cal. Jan. 31, 2023)

(finding that the City provides "no meaningful opportunity to raise indigency until after a substantial, and potentially final and irreversible, deprivation has already occurred").

64.     If the owner of a vehicle is unable to pay for the release of their vehicle, the vehicle may be sold. Cal. Veh. Code § 22851.1(a) ("If the vehicle is impounded pursuant to subdivision (i) of Section 22651 and not released as provided in that subdivision, the vehicle may be sold pursuant to this chapter to satisfy the liens specified in Section 22851 and in subdivision (b) of this section.").

65.     According to OPG-LA's website, "[t]he City of Los Angeles and the Los Angeles Police Commission regulate and set the towing and storage rates for the Official Police Garages. The towing and storage charges must be paid before the release of a vehicle." *Towing and Storage Rates*, OPG (last visited May 1, 2023), http://www.opgla.com/Rates.

66.     Defendants have set the following daily storage rates and charges for vehicles towed in the City of Los Angeles as of January 1, 2023: $47.50 a day for storage of a standard vehicle ($48.50 if the payment is made by credit card), a "City of L.A. Release fee" in the amount of "$115.00 for each vehicle released," and a "10% city parking occupancy tax is collected on all storage fees." *Id.*

67.     The City contracts with private garages, including Jon's Towing, to tow and store vehicles impounded upon arrest. Under that contract and the law, the City retains the authority and discretion to release impounded vehicles and waive any fines owed.

**C.     Defendants Unlawfully Impounded Plaintiff's Vehicle in Violation of the Fourth Amendment.**

68.     "A seizure conducted without a warrant is '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)). One such exception is the "community caretaking" doctrine, which "is available only to 'impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic.'" *Brewster v. Beck*, 859 F.3d 1194, 1196 (9th Cir. 2017) (quoting *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012)).

69.     On or about February 20, 2023, LAPD ordered the seizure of Plaintiff's vehicle when the Fourth Amendment demanded that the vehicle be released to Plaintiff's family or otherwise safely moved to a legal parking position. The vehicle was released on April 20, 2023.

70.     Defendants employ a custom, practice, and/or policy of towing and storing vehicles upon arrest without consideration for whether the vehicles' owners are unhoused and rely on their vehicles as their sole residence.

71.     Defendants have failed to train officers on the appropriate protocol for making a determination consistent with the Fourth Amendment of whether to impound the vehicle of an individual who is unhoused and relies on their vehicle for shelter.

72.     Defendants have shown a deliberate indifference in impounding, and failing to train, officers with regard to the impound of vehicles belonging to unhoused individuals who rely on their vehicles for residence.

73.     As Chief of LAPD, Chief Moore is a final policymaker for the City, and is responsible for approving and/or ratifying the unconstitutional customs, practices, and/or policies alleged herein.

74.     Defendants have a written policy governing the impound of vehicles upon arrest. *2022 Department Manual*, Vol. 4 § 222.05 (Impounding Vehicles When the Driver is Arrested). That policy permits the towing and storage of a vehicle without considering whether an individual is unhoused, resides in the vehicle, or lacks the ability to pay the fines imposed for the towing and storage of the vehicle.

75.     The customs, practices, and/or policies alleged herein are unreasonable under the Fourth Amendment.

76.     Impounding Plaintiff's vehicle was unreasonable under the Fourth Amendment.

**D.     Defendants Violate Due Process Through Their Practice of Towing and Storage of Vehicles Without Assessing an Individual's Ability to Pay.**

77.     The U.S. Constitution guarantees due process of law. U.S. Cont. Amend. XIV ("No State shall . . . deprive any person of life, liberty, or property, without due process of law.").

78.     Procedural due process of law requires notice and an opportunity to be heard. *See generally Mathews v. Eldridge* 424 U.S. 319 (1976). Moreover, "due process of law requires . . . an ability to pay hearing [to] ascertain [an individual's] present ability to pay" before the imposition of fines. *People v. Dueñas*, 30 Cal. App. 5th 1157, 1164 (Cal. App. 2019).

79.     "[T]he uninterrupted use of one's vehicle is a significant and substantial private interest," *Grimm v. City of Portland*, 971 F.3d 1060, 1063 (9th Cir. 2020), thus implicating due process protections. *See also id.* ("Towing practices disproportionately prejudice low-income populations as towing can permanently deprive low-income individuals of their vehicles (which often serve as their sole source of income or even their home)." (cleaned up )).

80.     Defendants employ a custom, practice, and/or policy of failing to provide individuals whose vehicles have been impounded any opportunity to demonstrate their inability to pay towing and storage fines.

81.     By towing and storing Plaintiff's vehicle with no consideration of Plaintiff's ability to pay, Defendants have flouted constitutional due process requirements. *Fitzpatrick*, No. 2:21-cv-06841-JGB-SP, ECF No. 106 at 25 ("[N]one of the procedural safeguards present in the storage hearing permit the impounding agency to order the immediate release of a vehicle for lack of constitutional authority, or seemingly even to consider equitable grounds . . . .").

**E.      The Costs Imposed by Defendants Constitute Unconstitutional Excessive Fines.**

82.     The Eighth Amendment of the U.S. Constitution mandates that "excessive fines" shall not be imposed. U.S. Cont. Amend. VIII.

83.     "[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." *Austin v. United States*, 509 U.S. 602, 610 (1993).

84.     Courts considering a claim under the Excessive Fines Clause must consider an individual's ability to pay. *City of Seattle v. Long*, 493 P.3d 94, 114 (Wash. 2021); *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 37 Cal. 4th 707, 728 (Cal. 2005).

85.     Defendants employ a custom, practice, and/or policy of requiring individuals to pay excessive fines in order to procure release of impounded vehicles.

86.     By demanding the payment of fines in order to procure release of Plaintiff's vehicle, without any consideration of his ability to pay, Defendants have imposed unconstitutional fines.

87.     The fines imposed by Defendants to procure release of Plaintiff's vehicle are real and not theoretical. For two months, Defendants refused to release Plaintiff's vehicle without payment of the fines demanded. Plaintiff was informed—and the statutory scheme provides—that his vehicle would not be released until he paid the amount owed.

88.     The fines imposed by Defendants cannot properly be characterized as remedial. Rather, because they were imposed on Mr. Urquidi as a consequence of his arrest, they are at least partially punitive, imposing on Plaintiff an unjustifiable penalty that deprived Plaintiff not only of his vehicle, but also his home. *See United States v. Bajakajian*, 524 U.S. 321, 328–29 (1998); *Long*, 493 P.3d at 110 (holding impound fines imposed by the city and a tow company constitute a partially punitive fine for Excessive Fines Clause purposes under *Bajakajian*).

89.     Moreover, Defendants' fines are grossly disproportional. *See, e.g.*, *Long*, 493 P.3d 94 (holding that a $500 fine payable over time on a payment plan was excessive for an unhoused individual).

90.     Not only are the fines paid disproportional to the original offense for which Plaintiff was charged for his conduct on the night of the impound, the fines increased each day he failed to pay his outstanding fines.

**F.     Defendants Inflicted a State-Created Danger by Seizing Plaintiff's Vehicle When They Were Aware It Served as His Sole Residence**

91.     The substantive component of the Due Process Clause under the Fourteenth Amendment protects a person's liberty interest in their own bodily security. *See Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir. 1989).

92.     A state-created danger may arise when government actions deprive an individual of their vehicles or shelters in the face of severe weather or other dangerous conditions. *See, e.g.*, *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000); *Wood*, 879 F.2d at 586; *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996).

93. On February 20, 2023 Defendants seized Plaintiff's vehicle—and deprived him of his sole residence—at a time when the homeless population in Los Angeles faced extraordinary risks due to the extreme weather conditions. *Winter Storms Likely*; *Race to Shelter Homeless People*; *Proclamation of a State of Emergency*.

94. At that time, Defendants knowingly engaged in affirmative conduct by towing, impounding, and refusing to release Plaintiff's truck in a way that rendered him without shelter.

95. Defendants had knowledge that Plaintiff was homeless at the time his car was towed on February 20, 2023 and that unhoused individuals faced extraordinary risks due to the extreme weather conditions and, therefore, were not only aware of the risk to Plaintiff but also acted with a callous disregard for the dangers.

96. Defendants' customs, practices, and/or policies of impounding vehicles upon arrest, without consideration of an individual's reliance on that vehicle for shelter, created the danger alleged herein.

## FIRST CLAIM FOR RELIEF

### Declaratory and Injunctive Relief

(Against All Defendants)

(28 U.S.C. § 2201, 42 U.S.C. § 1983)

97. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

98. Defendants violated the Fourth, Eighth, and Fourteenth Amendments of the U.S. Constitution by seizing Plaintiff's vehicle; by employing a practice of failing to consider individuals' ability to pay the fines associated with storage; and by also requiring the payment of excessive fines as a condition of release of the vehicle.

99. Additionally, Defendants violated Plaintiff's substantive due process protections under the Fourteenth Amendment by knowingly imposing a state-created danger by towing his truck.

100. Defendants employ the following unconstitutional customs, practices, and/or policies: towing and storing vehicles upon arrest without consideration for whether the vehicles'

owners are unhoused and rely on their vehicles as their sole residence; failing to provide individuals whose vehicles have been impounded any opportunity to demonstrate their inability to pay towing and storage fines; and requiring individuals to pay excessive fines in order to procure release of their impounded vehicles.

101.    LAPD Chief Michel Moore, a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved officers has been disciplined.

## SECOND CLAIM FOR RELIEF

### Fourth Amendment

(Against All Defendants)

(42 U.S.C. § 1983, U.S. Cont. Amend. XIV)

102.    Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

103.    Defendants employ a custom, practice, and/or policy of towing and storing vehicles upon arrest without consideration for whether the vehicles' owners are unhoused and rely on their vehicles as their sole residence.

104.    The City ordered the towing of Plaintiff's vehicle on February 20, 2023 in contravention of the Fourth Amendment.

105.    There was no reasonable justification for the towing pursuant to the community caretaking exception to the Fourth Amendment.

106.    Due to Defendants' actions, Plaintiff's vehicle remained impounded at the lot of Jon's Towing for approximately two months.

107.    The seizure of Plaintiff's vehicle violated the reasonableness requirement of the Fourth Amendment. Defendants cannot justify the seizure under the community caretaking doctrine. Accordingly, Defendants' actions directly and proximately caused the injuries incurred by Plaintiff including pain, suffering, and emotional injury, and entitle him to recover compensatory damages.

108.   The involved officers acted pursuant to the official policy and/or longstanding custom and practice of the City and Chief Moore.

109.   Defendants' official policies and/or longstanding practices or customs, including but not limited to their training policies, caused the deprivation of Plaintiff's constitutional rights; that is, Defendants' official policies and/or longstanding policies or customs are so closely related to the deprivation of Plaintiff's constitutional rights as to be the moving force causing his injuries.

110.   LAPD Chief Michel Moore, a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved officers has been disciplined.

### THIRD CLAIM FOR RELIEF

### Procedural Due Process

(Against All Defendants)

(42 U.S.C. § 1983, U.S. Cont. Amend. XIV)

111.   Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

112.   Defendants employ a custom, practice, and/or policy of failing to provide individuals whose vehicles have been impounded any opportunity to demonstrate their inability to pay towing and storage fines.

113.   Defendants impounded Plaintiff's vehicle without providing him adequate procedural due process under the Fourteenth Amendment.

114.   Among other procedural defects, Defendants failed to consider Plaintiff's ability to pay the fines associated with the towing and storage of his vehicle.

115.   Plaintiff has a substantial interest in his vehicle, which was his primary residence.

116.   The risk of erroneous deprivation through the procedures used by Defendants is high.

117.   The government's interests do not predominate.

118.   Defendants denied Plaintiff due process of law in violation of the Fourteenth Amendment by failing to provide Plaintiff an opportunity to demonstrate his inability to pay. Accordingly, Defendants' actions directly and proximately caused the injuries incurred by Plaintiff including pain, suffering, and emotional injury, and entitle him to recover compensatory damages.

119.   Defendants' official policies and/or longstanding practices or customs, including but not limited to their training policies, caused the deprivation of Plaintiff's constitutional rights; that is, Defendants' official policies and/or longstanding policies or customs are so closely related to the deprivation of Plaintiff's constitutional rights as to be the moving force causing his injuries.

120.   LAPD Chief Michel Moore, a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved officers has been disciplined.

**FOURTH CLAIM FOR RELIEF**

**Excessive Fines**

(Against All Defendants)

(42 U.S.C. § 1983, U.S. Cont. Amend. VIII)

121.   Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

122.   Defendants employ a custom, practice, and/or policy of requiring individuals to pay excessive fines in order to procure release of their impounded vehicles.

123.   The fines imposed by Defendants associated with the towing and storage of Plaintiff's vehicle constitute fines under the Eighth Amendment as they are at least partially punitive.

124.   The fines imposed and demanded by Defendants to procure release of Plaintiff's vehicle are excessive, are not solely remedial, and are grossly disproportional.

125.     Defendants' imposition of fines violates the Eighth Amendment. Accordingly, Defendants' actions proximately caused the injuries incurred by Plaintiff including pain, suffering, and emotional injury, and entitle him to recover compensatory damages.

126.     Defendants' official policies and/or longstanding practices or customs, including but not limited to their training policies, caused the deprivation of Plaintiff's constitutional rights; that is, Defendants' official policies and/or longstanding policies or customs are so closely related to the deprivation of Plaintiff's constitutional rights as to be the moving force causing his injuries.

127.     LAPD Chief Michel Moore, a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved officers has been disciplined.

**FIFTH CLAIM FOR RELIEF**

**Substantive Due Process**

(Against All Defendants)

(42 U.S.C. § 1983, U.S. Cont. Amend. XIV)

128.     Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

129.     Defendants' customs, practices, and/or policies surrounding the towing and storage of vehicles caused an injury to Plaintiff he would not have otherwise faced.

130.     On February 20, 2023, Defendants ordered that Plaintiff's vehicle be towed and refused to release it for approximately two months. Those actions affirmatively deprived Plaintiff of shelter at a time of particularly severe weather.

131.     The danger to Plaintiff was obvious to Defendants, as Defendants were aware that Plaintiff was homeless and that he depended on his truck for shelter, and knew or should have known of the danger presented by the severe weather.

132.     Defendants acted with deliberate indifference.

FIRST AMENDED COMPLAINT

133.   Defendants created a danger to Plaintiff would not have otherwise faced and, therefore, violated his right to substantive due process. Accordingly, Defendants' actions directly and proximately caused the injuries incurred by Plaintiff including pain, suffering, and emotional injury, and entitle him to recover compensatory damages.

134.   The involved officers acted pursuant to the official policy and/or longstanding custom and practice of the City and Chief Moore.

135.   Defendants' official policies and/or longstanding practices or customs, including but not limited to their training policies, caused the deprivation of Plaintiff's constitutional rights; that is, Defendants' official policies and/or longstanding policies or customs are so closely related to the deprivation of Plaintiff's constitutional rights as to be the moving force causing his injuries.

136.   LAPD Chief Michel Moore, a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved officers has been disciplined.

## SIXTH CLAIM FOR RELIEF

### Unlawful Seizure

(Against All Defendants)

(Cal. Const. Art. I § 13)

137.   Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

138.   Defendants employ a custom, practice, and/or policy of towing and storing vehicles upon arrest without consideration for whether the vehicles' owners are unhoused and rely on their vehicles as their sole residence.

139.   The City ordered the towing of Plaintiff's vehicle on February 20, 2023 in contravention of Article 1, Section 13 of the California Constitution.

140.   Defendants had no reasonable justification for the towing pursuant to the community caretaking doctrine.

141. Due to Defendants' actions, Plaintiff's vehicle remained impounded at the lot of Jon's Towing for approximately two months.

142. The involved officers acted pursuant to the official policy and/or longstanding custom and practice of the City and Chief Moore.

143. Defendants' official policies and/or longstanding practices or customs, including but not limited to their training policies, caused the deprivation of Plaintiff's constitutional rights; that is, Defendants' official policies and/or longstanding policies or customs are so closely related to the deprivation of Plaintiff's constitutional rights as to be the moving force causing his injuries.

144. LAPD Chief Michel Moore, a final policymaker for the City, approved and/or ratified the unconstitutional policy guiding Defendants' unlawful acts, and approved and/or ratified the actions and omissions of Defendants in that he had knowledge of and made a deliberate choice to approve their unlawful acts and omissions. Upon information and belief, the City took no action in response to Plaintiff's allegations and none of the involved officers has been disciplined.

## SEVENTH CLAIM FOR RELIEF

Bane Act

(Against All Defendants)

(Cal. Civil Code § 52.1)

145. Plaintiff incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

146. Defendants intentionally violated Plaintiff's constitutional rights as alleged herein and acted with at least a reckless disregard for those rights by seizing Plaintiff's vehicle in violation of the Fourth Amendment, denying Plaintiff procedural due process, requiring the payment of unconstitutionally excessive fines to procure the release of Plaintiff's vehicle, and creating a danger in violation of Plaintiff's substantive due process rights.

147. Injunctive relief and declaratory relief are appropriate to protect the peaceable exercise or enjoyment of the rights asserted herein, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct as described herein.

FIRST AMENDED COMPLAINT

148.     Defendants' actions directly and proximately caused the injuries incurred by Plaintiff including pain, suffering, and emotional injury, and entitle him to recover compensatory damages incidental to the injunctive and declaratory relief.

WHEREFORE, Plaintiff requests that this Court issue the following relief:

a.      Injunctive relief requiring the return of Plaintiff's truck without any requirement to pay the unconstitutional fines arising from the towing, impoundment, and/or storage;

b.      Injunctive relief prohibiting Defendants from employing the unlawful practices, customs, and/or policies alleged herein;

c.      A declaration that Defendants' policies, customs, and/or practices surrounding the towing and storage of vehicles, as detailed herein, is unconstitutional and is of no force or effect;

d.      An award to Plaintiff for statutory and compensatory damages, including pain, suffering, and emotional injury;

e.      Prejudgment and post-judgment interest;

f.      An award to Plaintiff for his expenses, costs, fees, and other disbursements associated with the filing and maintenance of this action, including reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and Rule 54 of the Federal Rules of Civil Procedure, California Code of Civil Procedure § 52.1, California Civil Code § 1021.5, and any other applicable statute or law; and

g.      Any other relief in equity or law that the Court deems just and proper.

DATED: May 1, 2023              Respectfully Submitted,

PUBLIC JUSTICE

By:   */s/ Leslie A. Bailey*
      LESLIE A. BAILEY
      Attorney for Plaintiff